## MEDICK v BULKLEY

Ohio Appeals, 2nd Dist, Franklin Co

No 2339. Decided Dec 29, 1933

James N. Linton, Columbus, and Hedges, Hoover & Tingley, Columbus, for plaintiff in error.

Clarence M. Addison, Columbus, for defendant in error.

644

## OPINION

**PER CURIAM**

The answer having admitted the writing of the letter set up in the petition, the court determined that upon a fair consideration of its import in its entirety it was slanderous per se. Thereupon the plaintiff was entitled to compensatory damages, full and complete. Likewise, on the state of the record, if actual malice shown, it was proper for the jury to award exemplary or punitive damages. Defensively the jury was required to determine: (1) Whether or not the libelous statements averred in the petition were true. (2) If not true, were they maliciously made and upon the question of the animus or malice actuating the statements to what extent mitigating circumstances appeared in the record. Justification and mitigation were expressly plead.

It is claimed that the court erred in refusing to permit the plaintiff at page 45 of the record to answer a question, the answer to which it is claimed would have disclosed that subsequent to the sending of the letter set forth in the petition the plaintiff had secured letters of recommendation in his behalf from many customers of the Medick-Barrows Company and particularly one from D. D. Spellman to whom the letter set forth in the petition was addressed. Objection was sustained to the question and though there was an exception noted to the ruling of the court there is no proffer of proof and the error urged is therefore not exemplified. At pages 201-202 of the record questions were propounded to the defendant in his examination in chief tending to elicit the subject matter of statements claimed to have been made to the witness by Mrs. Medick respecting the straightened financial condition of plaintiff.

We again find that the record is not made so that we can pass upon the question because we would have no proffer of what the witness would have testified had he been permitted to answer the question. Although the questions presented are moot, we are of opinion that the testimony that

D. D. Spellman, the writer of the letter upon which the action in libel is based, wrote a letter of commendation in behalf of plaintiff, would be competent. On the question of compensatory damages the jury had a right to consider this action of Mr. Spellman as it might reflect the extent to which the letter, the basis of the suit, damaged the reputation of the plaintiff in the judgment of the man who received the letter. Likewise, in our judgment, the statement of Mrs. Bulkley to the defendant that her husband was in straightened financial circumstances, if made prior to the writing of the letter set forth in the petition was competent, not for the purpose of establishing a defense to the libel suit but in mitigation of express malice in making one of the statements in the letter to the effect that Mr. Bulkley was in desperate need of money.

We consider the two major grounds of error together, namely: Misconduct of counsel for plaintiff and excessiveness of damages awarded by the jury. We have given careful and extended consideration to the record in this case, have read every line of the more than 800 pages in the bill of exceptions. We are satisfied that the verdict in this case is excessive. The length of this opinion, because of another matter considered, precludes citation and discussion of authorities. Suffice to say we find no reported case with subject matter comparable to the facts in the instant action, wherein a judgment in any sum approximating $25,000.00 has been permitted to stand.

Proof of compensatory damages in this case is meager. Plaintiff was discharged in 1931 and the period between the time of his discharge and the date of trial of this case must be recognized by judicial notice as a time of depression. The letters in every instance where not sent to salesmen of the company were directed to customers of the company and not to competitors. We would not say that the right to compensatory damages did not arise because the letters were sent to customers and not to individuals or concerns engaged in the same line of business as the company because they naturally impaired the effectiveness of the plaintiff as a salesman to his trade but these photographer customers were not prospective employers in the line of business in which the plaintiff was especially qualified. His failure to secure employment could as well have been referred to the depression as to the effect of the libelous letter written by the defendant. The fact that the plaintiff was

not employed by Mr. Chilcote or Mr. Mc-Cabe could not, in view of their feeling toward the plaintiff be a result of the libelous letter.

An examination of the subject matter of every sentence in the libelous letter set up in the petition is convincing that most of the statements in the broad manner in which made were not true and a defamatory charge is not justified when it exceeds the truth. However, there was some testimony offered by the defendant which the jury had a right to believe tending to support to a degree most of the subject matter of the libelous letter. The first objectionable paragraph: "Buck for the past year and a half has been worth almost nothing to the Medick-Barrows Company," is qualified in the letter wherein it is said: "He was desperate for money all of the time and felt that the only way he could get money in the amount he required would be to start a new business or make a new connection, while we felt that we were paying him twice to three times the amount he was really earning."

In the first sentence the writer of the letter states that plaintiff "Has been worth almost nothing to the Medick-Barrows Company," which is translated to mean, later on in the letter, that he is only worth one-half to one-third the amount he was being paid, namely, $5000.00 to $7,500.00 per year.

"He was desperate for money all of the time * * *," was overstated but there was supporting proof in the record to the effect that the plaintiff was at times distressed for money; that he had overdrawn his expense account and had given a note to his company for the arrearage. It also appears that there were other instances wherein the plaintiff was pressed for money.

"You are acquainted with his activities last year in trying to start a new company, which didn't materialize. He tried to carry water on too many shoulders, planning to take some of the men with him and they, when he stayed, naturally felt that he had thrown them down. The ones he was not planning to take felt, also, that he had turned them down and double-crossed them." There is evidence in the record tending to support this portion of the letter in its entirety. The plaintiff had undertaken to make a new connection with a competitor under circumstances that might bear the interpretation that he was not entirely fair to the company with which he was then employed, although we do not say that it would require such determination. It also appears that in the organization of the company there were employees who were dissatisfied because of the activity of the plaintiff and dissatisfied because of his return to the company, in view of his prior negotiations with Chilcote.

"Things went in Buck's home from bad to worse until he was almost a physical and mental wreck, so we terminated his services last Saturday." The charge that plaintiff was a "physical and mental wreck" was grossly overstated and clearly was not justified upon the record. But, that there was an unpleasant and unsatisfactory condition in plaintiff's home in connection with his second marriage may properly be inferred from the fact that plaintiff's wife divorced him almost simultaneously with discharge from the company. Upon no reasonable hypothesis can it be assumed that the marital relation was satisfactory or compatible in the light of the fact that a divorce decree was awarded against the plaintiff for his aggression during the period concerning which the defendant must have been speaking in his letter. Although the defendant was not justified in characterizing the plaintiff as a "physical and mental wreck" the testimony in one view permitted the inference that he was highly nervous, greatly excited at times and his ability to carry on the essential duties of his position was greatly impaired. The record is replete with testimony tending to support the claim of the defendant that the plaintiff did not carry on in his capacity as sales manager as he had promised to do and that he failed to go into the field and contact prospective customers, old customers and salesmen as would be most beneficial to the interest of his company. On the other hand the extent to which his services were of great value to the company was definitely set forth in the record.

What was the reason for the verdict in the sum of $25,000.00. After dispassionate reading of this record we are constrained to say that an impartial, careful analysis of the testimony will not support the verdict of $25,000.00. We believe that the reason must be found in part by the unfortunate observances and remarks of counsel in the presence of the jury respecting witnesses' testimony and subject matter in issue.

We believe, also, that the jury must have become confused respecting the measure of damages which it was in its province to award. The plaintiff was on a salary of $15,000.00 per year. His discharge by the defendant and its effect on the plaintiff was not a subject of an award of damages by the jury. This action, whether proper or unjustified, was only pertinent to be

considered by the jury as it reflected upon the question of malice in writing the libelous letter. A suit pending in court by the plaintiff against the defendant will determine when adjudicated the extent to which, if at all, the plaintiff has been denied compensation for the period during which his contract with the company continued. Likewise, the effect of the so-called conspiracy between McKabe, Chilcote and the defendant was not the subject of determination by the jury except as it might relate to the one question, namely, the animus of the defendant in writing the letters. It is probable that the jury may have felt that some damages flowed from the conduct of these three men in the light of statements of counsel.

The record is replete with page after page of extended and impassioned language in the presence of the jury. We believe that it would not be exaggeration to say that fully fifty pages of the record consist of statements much of which the jury in its proper province should have disregarded. In practical application counsel and the court know how difficult it is for the jury to separate the relevant from the irrelevant, the competent from the incompetent, under proper instructions from the court. In the interests of justice and expedition in the determination of law suits and to prevent re-trials with costly unnecessary and unusual delay, reviewing courts have permitted and supported the action of trial courts in withdrawing irrelevant and improper testimony and statements of counsel from the jury. But this practice may result in prejudicial error if the subject matter stricken is so extended and of such nature as to raise a probability that the jury was, by reason of having heard the stricken testimony, caused to be biased or prejudiced.

Our trial procedure contemplates arguments only after submission of all of the evidence in the case to the jury. In the instant cause numerous instances appear wherein the statements of counsel can be properly characterized in no other way than as an argument of fact to the jury during the trial. The record abounds with interpolation and arguments of counsel at times when there were no objections to the acceptance or rejection of testimony before the court. Critical remarks would be made aside respecting the statements of witnesses. We could not, within the proper limitation of this opinion, advert at full length to the numerous instances of doubtful procedure in the interrogation of witnesses and the presentation of legal questions arising upon the record to the court. We quote and consider enough of the record to be convincing.

At page 150 Mr. Chilcote was testifying on direct examination respecting a meeting which he had had with Mr. Bulkley subsequent to the time when the arrangement for plaintiff and Chilcote to engage in business had been abrogated. Mr. Chilcote was stating, under question, what he had said to Mr. Bulkley respecting his conduct:

"MR. ADDISON: I would like to have some kind of a ruling in here to apprise me, in my dense ignorance, how Mr. Chilcote—what his views about somebody else helps this case. Are we going to try Mr. Bulkley on what Mr. Chilcote thinks about him, is that what we are trying this case about, is this jury going to make up their minds because Mr. Chilcote didn't get his deal through, because he says his lawyer double-crossed him—or somebody else double-crossed him—now, what do these statements of Mr. Chilcote prove? Nothing in the world. That he is sore, because he didn't get Mr. Bulkley.

"MR. LINTON: That would explain then that we are not responsible for him not getting a job with Chilcote when we let him go, it would explain that much, wouldn't it?

"MR. ADDISON: How does that help this case, the charge that Mr. Medick made against Mr. Bulkley was that the people in his, that is, Medick-Barrows' factory was sore at Mr. Bulkley because he wouldn't take them with Chilcote, and now we have the proof here that it was the loyalty to those identical men and to Mr. Medick that made him stay.

"MR. LINTON: No, I don't think you have got that evidence.

"MR. ADDISON: That is exactly what Mr. Medick has said—now, answer that, this man proceeds to deliver a sermon on how terrible this is. This man who was trying his very best to take Mr. Medick's best men away from him was terribly shocked at the disloyalty of Mr. Bulkley being disloyal to the people that he had been with for fifteen years, and then he proceeds to deliver a homily here to this jury, and your Honor is taking it as evidence.

"MR. LINTON: We are giving a conversation, we are not through with it.

"MR. ADDISON: It is a homily, what a terrible suffering he underwent because he didn't get Mr. Medick's best man."

At page 171, cross-examination of Mr. Chilcote, query was made respecting a meeting Mr. Medick and the witness at the

Hotel Deshler, Columbus, sometime prior to the convention at Cedar Point in 1931. The question was asked whether or not they discussed that Mr. Bulkley was going to take charge of the convention at Cedar Point. It was answered in the negative:

"Q. Never was discussed. And then did you discuss the proposition that as soon as that was over Mr. Medick would discharge Mr. Bulkley and send a letter to the president of the Association and broadcast it all over the country so that Mr. Bulkley, whom you said was the best man in the United States, would be put out of competition with all three of them?

"MR. LINTON: Object to the question.
"THE COURT: Objection sustained."

The court held that the question was both incompetent and argumentative, and there was nothing then before the court for ruling. Thereupon, this colloquy:

"MR. ADDISON: I do not understand how you can say that is incompetent.
"THE COURT: It assumes that which is not in evidence, if I recall.
"MR. ADDISON: Well, since when does a question on cross examination have to assume what is in evidence?
"MR. LINTON: Well, it cannot assume a thing that is not in evidence.
"MR. ADDISON: I never heard that thing applied in cross examination before.
"THE COURT: How do you say this is competent?
"MR. ADDISON: It is perfectly competent, here is what happened if these people would tell us the facts—what was McCabe doing in Columbus, what was Chilcote doing in Columbus? McCabe, remember, was the man they testified that Mr. Bulkley tried to get employment with. Mr. Chilcote was the other man, Mr. Bulkley is the third man. Now, the first time Mr. Chilcote said that he ever discussed Bulkley with Medick was when they had that meeting, the three of them over in the Deshler Hotel and there they discussed the relationship between Bulkley and Medick, a little bit before the Convention. Now, Mr. Medick sends Mr. Bulkley to the convention, remarkable, that he was in the condition that he says he was; two months, after that he sends him to the convention because he wants to get the full benefit of his services. As soon as the convention is over, then what does he do, he sends out this letter and what does he have in the letter, I beg of you, he has the information that he got from Mr. Chilcote at that meeting. If that

don't show a conspiracy I never saw one, that is the very thing we are talking about, and that is the very first time that Mr. Chilcote ever talked with him about it was in the Deshler Hotel and that is the very thing he puts in his letter right upon the discharge of Mr. Bulkley. Now, what is the inference to be drawn from that? True, conspirators will conceal their purposes, but what legitimate inference may we draw from the fact that Mr. Chilcote had never talked this matter over with Mr. Medick before? There was no explanation of why Mr. McCabe was coming here, there is no explanation of why these people should meet in the Deshler Hotel. Mr. Chilcote says he didn't like Mr. Medick, he didn't want to make any kind of a business deal with him in regard to credit. If he didn't, why did he come down here, why did they have that meeting in the Deshler Hotel? I will tell you what they had it for, Chilcote was sore, McCabe was sore and Medick was sore, and the three of them got together with the determination of putting out of business the best photographic man in the United States according to their own admission, and that is why they sent out that letter, and that is why Mr. Medick said give it to P.A.A., spread it to all of the boys, that is what he said in his letter, told Benny Craine, tell George Stafford, tell him to tell everybody else. That was the purpose of that meeting and nothing else. If they wanted to discuss those kind of things, it was only a month until the Convention and those are the kind of things they could discuss at the convention. There was no excuse for Mr. Chilcote's trip down here and no excuse for Mr. McCabe except to get together with Mr. Medick to go after Bulkley. Now, they admit they were there to talk about Mr. Bulkley. If they were to talk about credit matters alone, why was Bulkley brought in as part of the conversation? They admit they discussed him, and he admits he came down here to Columbus and McCabe came here from some place else and they following that in the very first letter Mr. Medick puts out——."

Without further quotation, for two pages more arguments pro and con were delivered. The court patiently listened to the extended presentation and then sustained an objection to the question propounded four pages before on the ground that it was irrelevant, incompetent and argumentative, to which ruling counsel for plaintiff observed, "Anything else wrong with it?" All of these statements were made in the presence of the members of the jury and illus-

trate how difficult it would be for them to disregard the assumption of counsel not supported by the record and the suggestion of inferences required to be drawn from the facts, some of which were and some of which were not in evidence. It also discloses that a general argument was made respecting the subject matter of the suit during the trial and not after the submission of evidence as is contemplated in orderly procedure.

At page 232 the defendant was testifying on direct examination. The court was permitting the testimony respecting statements made to the defendant by salesmen of the company, wherein they had indicated dissatisfaction with the plaintiff's connection with the company because he had invited some of them to go with the organization contemplated by him and Chilcote and had failed to invite others and in the face of this action was permitted to remain with the company. The import of the testimony was to show the good faith of the defendant in his statement in the libelous letter that some of the employees believed that they had been double-crossed by the plaintiff. Some of the men had expressed dissatisfaction with having to stay in an organization headed by the plaintiff after his connection with the transaction setting up another company had come to their attention. The question, at page 233, was:

"Q. Now, take your next man, this New York man.

"MR. ADDISON: I think this has gone far enough. The court better look into the law a little here, just think of the preposterousness of that statement to start with. Now, here is a letter in which Mr. Medick says that Mr. Bulkley in one letter he says he was not worth a plugged nickel and in another he says that he was almost a physical and mental wreck, that he was not worth one-third of what they were paying him for, he was carrying water on both shoulders—too many shoulders—having trouble with his wife, and then he comes here upon the witness stand and details that somebody else told him that if this physical, mental derelict went out of the Medick-Barrows Company that the whole families would be ruined and the Medick-Barrows Company would sink down into oblivion.

"MR. LINTON: Of course, nobody has said that.

"MR. ADDISON: Just think of such a thing, that Mr. Bulkley was so essential to that company, although he was a mental and a physical wreck, no account for a year

and a half, that the mere suspicion that he was going to leave the company would wreck the whole company.

"MR. LINTON: Nobody has testified to that.

"MR. ADDISON: That is what he said Mr. Billingsley told him—'If he left us, he was of no account, he was worthless to this company and I had tried to fire him three times, but if all this had happened the Medick-Barrows Company would have been wrecked and my poor family would have been without bread.'

"MR. LINTON: And that has not been said and you know it.

"MR. ADDISON: He just did, that Mr. Billingsley came to him and said, 'Why if he left here, he didn't think of my poor family.' Why didn't Mr. Medick with his big salary and his big dividends have anything to support Mr. Billingsley? Why the whole thing is so preposterous that the whole thing is ridiculous."

Reference is made to much of the subject matter of the letter but none to that part concerning which the evidence offered was competent. The inferences drawn were not warranted by the testimony to be elicited.

At pages 324-327 inclusive, the defendant was under cross examination respecting the statement in letters offered in evidence that the second marriage of plaintiff "was a terrible mistake."

"Q. Now, if what you have said about Mr. Bulkley's wife was true and that is all the poor woman did, why was you telling this to Mr. D. D. Spellman, how was he interested in this woman? A. It must have been a mistake or he wouldn't have sued—she wouldn't have sued.

"Q. How was Mr. Spellman interested in this woman who had not done a single thing but call her husband? A. He was interested in Mr. Bulkley.

"Q. I ask you how he was interested in this woman that you slandered? A. I don't know that he was.

"Q. Then why did you tell him about it? A. As part of the reason I discharged Mr. Bulkley.

"Q. Why did you say this woman was not right? A. I didn't.

"Q. You said he had made a terrible mistake, you meant to convey to this man that she was not a good woman? A. No, sir.

"Q. Why not, you said the marriage was a terrible mistake? A. It was not on account of her not being a good woman.

"Q. Then what did you mean? A. I

meant that Mr. Bulkley could not attend to his job on account of his marriage.

"Q. You haven't told a thing except that his wife called him up a few times at the office. Now, why did you think it was necessary to broadcast this to all these people that Mr. Bulkley was having some trouble even' if it had been the truth? A. Will you allow me—

"Q. I will allow you to explain your conduct in slandering any woman, if you want to do it, tell the jury why.

"MR. LINTON: Object.

"Q. Tell this jury why you wrote this.

"MR. LINTON: I am going to be heard. He made the statement 'I want you to explain your conduct in slandering a woman.' Now he had not slandered any woman. This suit is not about the slander of any woman, he has denied that he said anything about the woman not being a good woman. Now, I want to object to counsel taking any such a question when there is no evidence to support it.

"THE COURT: Yes, Mr. Addison, I did not hear the question, but I am assuming what counsel has stated is correctly stated, there is no ground for assuming that the woman was slandered.

"MR. ADDISON: Well, will you listen to this and see if you would like to have it said about your wife, 'I could have ironed that out, but his second marriage was a terrible mistake. That made his working almost impossible. I will tell you more about it when I see you in person. Things went in Buck's home from bad to worse until he was almost a physical and mental wreck.' Now, if that is not a charge against the wife, I don't know what is. 'Things went from bad to worse in Buck's home until he was almost a physical and mental wreck.'

"THE COURT: Now, what is the question?

"MR. ADDISON: Now, that charge against Buck is libelous per se. Now the charge is it was due to his wife, and they say it is not slander on her."

Thereafter, for almost two pages the line of questioning proceeded, although the court had definitely indicated that there was no ground for assuming that the defendant had slandered plaintiff's wife as contended by counsel, and at page 327 this question:

"Q. You are going to tell some more gossip? A. He came out to see what we could do.

"Q. Wait a minute. I am getting mighty

sick and tired, it is always what somebody told him. I am asking you if you personally knew anything about this woman and you told this jury you tell us all that you know. Now, I don't want any more of your dirty gossip about this woman. tell what you know.

"MR. LINTON: Object.

"THE COURT: Sustained, and, members of the jury, you will disregard the statement of counsel.

"MR. ADDISON: I am getting sick of this man there uttering against this man's wife and not being able to back it up, it shows the character of this man and the maliciousness of the letter, it didn't make any difference who was hurt, he was willing to broadcast it from Maine to California if it would save his company a dollar."

This last statement was objected to and the jury was admonished to disregard it, but it and much that had gone before was unwarranted and impassioned and notwithstanding the warning of the court had a tendency to inflame the jury and subject it to an atmosphere of prejudice.

At page 404 of the record, the cross-examination of the defendant, counsel had been interrogating the witness respecting the amount of sales that the plaintiff had made for five years prior to August, 1931. The books of the company were in the court room and from these books counsel was insisting that the defendant state the amount of business that the plaintiff had produced. The gist of the answers was to the effect that the witness could not do this because he was not familiar with the books. However, counsel bore down upon the witness, insisting on an answer and finally, after almost two pages of questions and answers the following occurred:

"Q. Then why did you make that statement to Mr. Mersereau and Mr. Spellman that he was worth almost nothing if you don't know now from your own records how much he produced? A. If you let me make an explanation I will tell you.

"Q. Answer that question. A. I have the information.

"Q. Then give it to us. A. I have it as a matter of record.

"Q. Well, give it to us. A. I cannot give it to you, there is a lot of things I cannot give you pertaining to that business, those other people can do it, he can give that information as well as I can.

"Q. We are getting pretty much disgusted with this manner of answering of this, wasting a lot of time dodging. A. I am not dodging."

At pages 432-433 of the record Mr. Anderson, Secretary and Assistant Treasurer of the company, was being interrogated in chief respecting a conference between Mr. Medick and Mr. Bulkley at which the witness was present. The subject matter of conference related to the plaintiff's duties under the reorganization of the company, by which the plaintiff became sales manager and vice president. The statements that Mr. Medick had made to Mr. Bulkley were the subject of query as were the statements made by Mr. Bulkley to Mr. Medick. Touching the obligations and duties which the plaintiff would be required to perform under the reorganization, several questions had been propounded tending to elicit just what Mr. Medick had said to Mr. Bulkley respecting these matters. This testimony obviously was relevant and competent. In part the record discloses, page 432:

"Q. What, if anything, did Mr. Bulkley say at that conference as to his complying with the rules of the company? A. He said he felt in this reorganization that he could get out and put his whole heart into the business and would comply with all the rules and policies of the company.

"Q. Were any of those things specifically mentioned? A. As to keeping up his trip lists, his daily reports to the office and his daily expense account, anything that was required of any other salesman.

"Q. Was there anything said by Mr. Bulkley as to what his personal conduct would be? A. That he would cut out drinking and would give his full time to the business."

Without objection or motion to strike out the answer the record discloses the following:

"MR. ADDISON: Not one word said about Mr. Bulkley's drinking. Mr. Medick sat there and said he never saw Mr. Bulkley drunk in his life and never saw him drinking about the office, and there isn't one word in this libel here about Mr. Bulkley drinking, not one word in the petition that they are justifying this libel on that ground. Now, this man is just sitting here parroting what Mr. Medick said, it has nothing whatever to do with this case.

"THE COURT: I think this should go to the jury and let the jury determine what value it has—

"MR. ADDISON: To prove that, what has it to prove?

"THE COURT: The court hesitates to discuss this.

"MR. ADDISON: What does that tend to prove? Now Mr. Bulkley does not drink and nobody ever said he drank. He is not charged in this libel with having been a drunkard. He is not charged with neglecting his business on account of drink. They do not set up that he drank as a justification. Now, if this thing keeps up, your Honor will be compelled to charge the jury during this trial—there is such a thing in law as increasing the consequences of libel by libeling a man in the trial of the case. Now, if they want to assume that responsibility and Your Honor wants to assist them in it, go ahead.

"THE COURT: That last statement is wholly unwarranted—do you think the court is assisting them?

"MR. ADDISON: It is in that because you are absolutely wrong.

"THE COURT: You save your record. The court is absolutely right. Proceed, and I am not saying that in any feeling, but I believe your statement is wholly unwarranted. Proceed."

The vice is apparent in these comments of counsel without elaboration.

At page 442 of the record, Mr. Anderson had answered a question respecting the condition in which Mr. Bulkley had done his work. He answered:

"A. His work was put off from time to time mostly, he didn't do it at the times it should be done, it would be put off from day to day for one reason or another and brought up at later dates. He didn't carry it out at the time he should and a lot of it was never completed.

"Q. What, if anything, was the result of the work being done in that manner? A. Well—

"MR. ADDISON: I move to strike out the latter part of the witness' answer. 'He didn't do his work as it should be done,' because there is no showing that this man—

"THE COURT: 'He didn't carry it out at the time he should,' is objectionable."

The court had sustained the objection of counsel. Then followed this observation:

"MR. ADDISON: As far as any qualification, that this man is qualified—now, here is a $6,000.00 employee, who has some kind of a job about the factory, presuming to sit here on the witness stand and give an expert opinion of the vice president of the company on a $15,000.00 salary. If this man knew more about it than Mr. Bulkley, it looks like he should have the $15,000.00 instead of the $6,000.00. Now, who is he that he presumes to sit in judgment on the sales

manager and say his work was not done right, has he shown any qualification for it?"

At page 445 Mr. Anderson was stating that in June, 1931, a conference was held at the office of the company attended by Mr. Medick, Miss Justice, Mr. Medick's secretary who was a stockholder of the company and the witness. It appeared from the evidence that objection had been made to Mr. Medick both by Mr. Anderson and Miss Justice respecting certain claimed derelictions of duty by the plaintiff in his office as sales manager of the company. Mr. Medick had called in Mr. Bulkley and the other parties to take up with him these complaints. The witness had been permitted to state in part what Mr. Medick had said to Mr. Bulkley at the meeting. The testimony clearly was competent. The credibility of the witnesses, the weight of the testimony was for the jury. The evidence was relevant and pertinent and reflected directly upon the statements in the libelous letter concerning the value of Mr. Bulkley's services to the company and particularly as it might relate to the maliciousness of the statements in the libelous letter. It showed what, from the standpoint of the defense, had lead up to Mr. Bulkley's dismissal. The plaintiff's claim was that he had been discharged wholly without justification and had been permitted to testify freely and offer evidence in support of that claim.

At page 444 the following appears:

"Q. Now, I wish you would tell what was said at that conference as near as you can and who said it?

"MR. ADDISON: Object to the question.

"THE COURT: Overruled.

"MR. ADDISON: Note an exception.

"THE COURT: Now, Mr. Bulkley was present, was he, at this conference?

"THE WITNESS: Yes.

"THE COURT: Proceed."

The court had ruled on the objection to the question, counsel saved his exception and the court had instructed counsel to proceed. Notwithstanding, the following occurred:

"MR. ADDISON: Would that permit them in view of the fact that they were expecting to get rid of Mr. Bulkley—

"MR. TINGLEY: Object to that statement.

"MR. ADDISON: Just a moment, would that justify them, in view of the fact, if it be a fact, that they were intending to get

rid of Mr. Bulkley in August, which they did, and naturally would begin to frame their evidence for that purpose, could they then come in and make statements to him and then go away and testify to them?

"MR. LINTON: I object, no evidence to justify the statement of counsel.

"THE COURT: Sustained.

"MR. ADDISON: Note an exception.

"The COURT: Proceed.

"A. (Continuing) We were called into this conference in Mr. Medick's office. Mr. Medick and Mr. Bulkley had been talking together, and Miss Justice and I were called in to this conference. When we went into the meeting Mr. Medick stated to us that he had told Mr. Bulkley some of the things that we had objected to.

"Q. Now, what were they?"

(Black face ours).

The court had now ruled twice definitely upon the objections of counsel and without further objection to the court this statement was made:

"MR. ADDISON: Now, Your Honor, do you want any better evidence than I stated a while ago—he is telling just exactly what I said happened. Mr. Medick called these two people in there to have witnesses."

(Black face ours).

These observations of counsel were proper if at all only in final argument to the jury. At that time the motives of the witnesses could be questioned, the truth of the statements challenged and if the evidence in any view supported the claim that there had been collusion and an arrangement to frame the plaintiff that principle could have been developed by counsel but it was highly improper and unjustified to expressly charge the witness, in the midst of the testimony which the court had several times declared to be competent, with being a party to framing the evidence. It was equivalent to a charge of perjury against a witness whose testimony had not been impeached. No such procedure is contemplated in the orderly processes of a trial. It denies to a witness that courtesy and fairness of attitude to which he is entitled.

At page 726, et seq., of the record the plaintiff was on the stand in rebuttal. He was being questioned respecting his application for a position to the "District of Columbia president, (Mr. Nicholson) when he was here in Columbus." Over objection the witness was permitted to say that Mr. Medick had talked to Mr. Nicholson before the Columbus meeting. Counsel for plain-

tiff was insisting that the jury had a right to draw an inference that Medick had influenced Nicholson against Bulkley from the one fact that Mr. Medick had seen and talked with Nicholson before Bulkley had applied to him for a job. It seems elementary that such inference could not logically be drawn and should not have been urged. There were two ways to prove that which was sought to be established by inference, namely, by showing that Mr. Medick had admitted the conversation with Mr. Nicholson or by the testimony of Mr. Nicholson or some one who was present and heard the conversation. Notwithstanding this obvious application of the law almost ten pages of the record are given to observations and arguments of counsel and statements by the court, all in the presence of the jury. The subject matter of the observations and statements was such that the jury may have been prejudiced in their views of the evidence and may have drawn inferences from the extended arguments which under the law they should not have done. An examination of the record fails to disclose that any question to the witness was pending which required or justified that which we hereafter quote.

The record in part at page 726, et seq.:

"Q. Do you know whether or not Mr. Medick had talked to him before that? A. Yes.

"MR. LINTON: Object to this, it is hearsay.

"THE COURT: That is not hearsay, he is asking him if he knows.

"MR. LINTON: Let's find out what was his answer to the Philadelphia, that they told him—

"THE COURT: The immediate objection is with reference to the Washington employment. Now, he says he knows that Mr. Medick was there, I don't know, you may inquire to find out.

"MR. ADDISON: Do you want to cross-examine him at this time to find that out?

"MR. LINTON: Yes. Mr. Bulkley, how do you know, through what Mr. Medick told you or the Washington man?

"THE WITNESS: Through what Mr. Nicholson—

"MR. ADDISON: What we are trying to prove is that this man did not get a job, Mr. Medick had been there before and then when he applies for a job he tells him that Medick has been there. Now, it is the old— it is just like the case of B. O., your best friends won't tell you—here is a man that applies for a job. He would hesitate to say, 'I am not going to hire you, because

Medick has slandered you,' he naturally would make some other excuse. Now, the only way we can prove it to show that Medick had been there, he applies for a job and he learns from the man that Medick had been there and he don't get the job. Now, that is all the way we can prove this unless the man just came out and said, 'Why, I won't hire you, because Medick said these things about you,' which wouldn't happen one time in a thousand. You will commit some offense, or somebody claims you committed an offense and you go out on the street and you meet somebody that thinks they are a lot better than you are and they never skidded themselves and they see something interesting on a sign or a store window. You go out in a crowd of your friends and you see a group of them standing over here whispering; you are not invited any place if there is a golf game to be put on; you are not invited into it. Every place you go to get a job, 'No, we are full up, we haven't any job.' Now, not one of those people perhaps if put on the witness stand would say, 'No, I didn't turn and look in Lazarus window and turn my back on Nelson Bulkley, I just happened to be looking in the window.' They wouldn't stultify themselves. Now, it is circumstantial evidence and that is all the kind of evidence you can get when a man is injured in this way, when his reputation is ruined and his friends go back on him and the men won't employ him and his friends do not greet him as before. You cannot get them to go on the witness stand and say they are so small that they hold that against him, that is the abominable part of a slander and a libel, you are ruined and you are helpless.

"MR. LINTON: Now, if the court please, I can see a great many people in a conversation that I do not hear. If I have got something on my own conscience I may fear that they are talking about me, but is that any reason why, without knowing anything about it, it is to be given to the jury as a fact that they are talking about me. Your Honor, can't a man—if you discharge a man, don't you try to continue to do business with your customers, don't you try to continue to do business with the people you buy your stuff from, don't you try to do that? Is there to be a presumption that you have done wrong and is the evidence to be given to the jury with the implied sanction of the court that they are justified in drawing that presumption? There is no such evidence as that. There is no such rule of evidence as that. Let me ask one more question of the witness:

What was Nicholson's business? He sold supplies to the Medick-Barrows Company, didn't he?

"MR. ADDISON: Don't try to do two things at once. You have advanced a reason here why this evidence is not competent, and if you are going to argue, argue. If you are going to question, question. Which are you going to do?

"MR. LINTON: If you sit down, you will learn.

"MR. ADDISON: No, I am not going to sit down.

"MR. LINTON: Then stand up and learn. There is no such rule of evidence as Mr. Addison contends in this or any other civil case, not any, it is as vicious as it can be. There is no way a man can be protected and he says in his argument to support it, that there is not a one of them, if put on the stand, would say that, and Mr. Medick has testified that he never said a word about any such thing as that. Now, your positive evidence—

\* \* \*

Continuing at page 731:

"THE COURT: You claim there is not an inference here?

"MR. LINTON: Certainly, you haven't got any evidence that he said anything to these people at all against this man. Now then, where have you got a right to draw an inference that anything reprehensible took place, and you have got to have that inference before you can infer there was a reprehensible inference flowed from it, and that is where we are, no facts, no evidence at all. Suspicion from beginning to end that it might have happened. I most seriously do object to what counsel has been good enough to say 'Probably there wouldn't one of them say so if called.' What are you going to do, the defendant denies it, counsel for the other party says if they call them, they probably won't, and then you go ahead and give to the jury—the jury has got a right, if Your Honor allows it in, to infer it is evidence from which they can draw a conclusion, and I most seriously contend there is no basis for it in law or in justice either one.

"MR. ADDISON: Now, the entire argument is that there is no such thing as circumstantial evidence. I want to suggest both to the court and counsel that you have limited the rule of circumstantial evidence contrary to the overwhelming weight of decisions. It is not necessary to prove a thing by circumstantial evidence beyond a reasonable doubt, which would be the rule as Your Honor announced it and

as Mr. Linton concurred. Now, I will show you legions of authority that if the jury may legitimately draw an inference from an established fact you have a right to establish that fact. I recall very distinctly of a number of cases that I gathered together, and among them was one in which a man was found along the railroad track with an automobile broken to pieces and dead. They sued the railroad company, nobody saw a train come along there at all or heard a whistle, nobody saw the accident or knew how that man's automobile got destroyed and how he got killed and he recovered and it was sustained. You go out in the field in the morning and you find a number of sheep dead and you go out the next morning and you find a number of sheep dead, and you go out the next morning and you find a number of sheep dead, you find a lot of white hairs on the fence, you find blood on the dog's mouth, he has been seen running through the field, but nobody saw him kill the sheep. The buzzards might have killed them, they might have died of foot rot. Those hairs might have come from a horse's tail. The blood on the dog's mouth might have been from gnawing a bone. But I wouldn't give much for that dog's life if you made that case against him. Why, we hang men every day on circumstantial evidence in which they could be innocent. So, to say that you must prove a thing by circumstantial evidence and exclude every other hypothesis is an incorrect statement of the law. The law is that if the jury from the surrounding facts and circumstances may legitimately draw an inference they have a right to do so, and you find at least a dozen Supreme Court decisions right smack on that point, and a thousand in the other states. Now, here is a man that has announced, Mr. Bulkley says at least three times, that Mr. Chilcote had told him that he had fixed things so that he couldn't get a job—

"THE COURT: What is that statement, Mr. Addison?

"MR. ADDISON: Mr. Bulkley testified here awhile ago that Mr. Chilcote had told him that he had fixed things so that he couldn't get a job, so that Mr. Bulkley couldn't get a job, that is the evidence in this record here.

"MR. LINTON: We are responsible for what Mr. Medick said he did. That don't make us responsible for what Mr. Chilcote did.

"MR. ADDISON: Now, they have their conference in the hotel, and immediately after that Mr. Medick comes back and

struts like a game cock, and 'I can fix you so you can't get a place anywhere else.' That is what Medick told Bulkley. Now, what happened? He does fire him and he goes out to look for a job, and when he gets to that job he finds Medick's tracks here; he has been there and he has left the hairs on the fence and the blood is on his breast and he has been seen in the field. Now, did he kill the sheep? Now, Mr. Linton says the presumption is that business men talk business matters. The presumption—but not with Medick. Read his business letter. Did they deal with business? No, they deal with the most intimate associations with this man and his wife, that is what they deal with, they deal with the misfortune that happened to a boy two years old. Is that business? Now, what can this jury legitimately infer if that is the character of letters that Mr. Medick writes and asks them that they be spread to the P.A.A. and several other letters of that kind—send out to the business people. What has this jury a right to infer that he should say when he got to these men that he knew and expected Mr. Bulkley would apply to for a job. He would repeat the same contemptible slander that he has been guilty of in these letters. We are not dealing with an ordinary business man, we are dealing with a man who parades before the public men's infirmities and their wives infidelities, not business. That is the kind of a man we are dealing with and that is the kind of a man this jury must judge when they determine whether or not he would carry this further.

"THE COURT: Is there not an inference here on an inference, that is, that you first infer that these people to whom Mr. Bulkley applied for employment, was in need of his services, or services of the kind and character that he wanted to render, and then further, that needing it, they refused to employ him because of these things about which you complain. Now, is not that an inference on an inference?

"MR. ADDISON: No, take the sheep case, is not that an inference on an inference?

"THE COURT: No.

"MR. ADDISON: What is the difference?

"THE COURT: The sheep were dead and the dog—

"MR. ADDISON: Well, Bulkley has no job.

"THE COURT: Well, he has no job—but we do not find any blood on him or wool in his teeth.

"MR. LINTON: Now, I want at this time to make the record. I want to object to the statement that Mr. Addison has made about this defendant as reprehensible and not justified by the evidence and then I would like to be heard a little more on this matter, on the question that is before this court, whether this witness can tell what Mr. Nicholson told him here in Columbus with reference to Mr. Medick, that is the matter before the court. Now, if they want to go back—

"THE COURT: That is not the question, is it?

"MR. ADDISON: No, I didn't ask him what Mr. Nicholson said.

"MR. LINTON: Yes, you asked him how he learned Medick had been there and he said yes, he learned from Nicholson and I am objecting to that. Now, with reference to the sheep and the dog, it sounds good, but there isn't any hair, there isn't any blood, there isn't any evidence that there is any dead sheep that have been torn by teeth that Mr. Addison wants the court to assume if you were to find two or three sheep dead, without a mark on them, no blood on a dog's mouth, and it was a white dog—no, white hairs on the fence, and then want to introduce the evidence that John Jones had a white dog that went through a field and there was some sheep found dead without a mark on them, introduce it in evidence for the jury to draw a conclusion that by some mysterious means this white dog, that was never seen near the sheep, blew his breath on them and killed them and never left a mark. Now, we haven't got this with Mr. Medick at all, you have got thousands and thousands and thousands good salesmen walking the streets that are not photographic salesmen, that are splendid men; their concerns have gone into the hands of a receiver, and former presidents are chefs, and salesmen have no jobs, and in that kind of a condition which we all know of, you argue against this man, Mr. Medick, the defendant that every inference shall be drawn against him, with no evidence whatever to back it up. He don't dare to speak to a man, but what if that man don't give him a job, the jury is asked, with the court's sanction, to consider that as evidence that he kept him from getting a job, whether the man was discharging salesmen or not; whether he needed them or not. You have thrown in here, I didn't throw it in, opposite counsel did, that Chilcote is supposed to have said that he had it fixed so that if Medick fired him nobody else would give him a job. If that is so, we are not responsible for that. Mr. Medick denied that Chilcote said it to him. But if Chilcote said it to him, we are

not responsible, that is not our fault and I do not know what more I can say to the court—my memory in the immediate matters here is as to whether this witness can tell what Nicholson said to him with reference to whether Medick had told him or not.

"THE COURT: That is the substance of it.

"MR. ADDISON: We will show by this witness that your client in Philadelphia hired a new salesman two weeks after Mr. Bulkley made his application and he had an application from the man that Mr. Chilcote—and their man who has testified in this case said was the best one in America and he turned him down and hired another man. We are not relying on the presumption he didn't need a man, but we will show that he did need another man but he didn't hire Bulkley after Medick had been there.

"THE COURT: This is reflecting upon the allegation of special damages?

"MR. ADDISON: Yes.

"THE COURT: The court at this time will sustain the objection; if the court is in error the court can later on correct it.

"MR. ADDISON: Note an exception.

"(Question and answer read as follows): Q. Do you know whether or not Mr. Medick had talked to him before that? A. Yes.

"THE COURT: The only way you know that Mr. Medick talked to Nicholson is what Mr. Nicholson told you.

"THE WITNESS: Yes.

"THE COURT: All right, the objection is sustained and the jury instructed to disregard the answer.

"MR. ADDISON: Note an exception.

"MR. LINTON: I move to strike out the answer.

"THE COURT: Sustained.

"MR. ADDISON: Note an exception."

We quote from opinions of the court in two leading cases in Ohio: **Baxter v State, 91 Oh St, 175.**

"The altercations between counsel, side remarks by counsel loud enough to be heard by the jury, comments by counsel during the trial upon evidence offered or answers made by witnesses, are all equally out of place in a court of justice."

**Hayes v Smith, 62 Oh St, 161,** was a case wherein counsel had, in argument, charged the defendants in the case with stubborn, unrelenting effort to suppress the truth. Other inordinate statements had been made. The court in discussing the matter, at page 186 says:

"The language which was objected to is reprehensible to the last degree. It is none the less reprehensible and none the less inexcusable, because it was spoken by counsel of standing and ability. * * * Just and severe invective, which is supported by the testimony, is not improper. A generous latitude should be allowed to counsel; but the argument should always be decorous and should not impair the impartial administration of justice. Therefore, as it was held by the Supreme Court of North Carolina, in Coble v Coble, Admr., 79 N. C., 589, 'it is not within the privilege of counsel, in argument to a jury, to use language calculated to humiliate and degrade the opposite party in the eyes of the jury and bystanders, particularly when he has not been impeached'."

At page 187, quoting from Rolfe v Rumford, 66 Me., 566:

"The courts have usually been very firm, whenever occasion had required, in confining counsel within proper and reasonable bounds to whatever is pertinent to the matter on trial. Statements of alleged facts not adduced in evidence, and comments thereon are irrelevant, not pertinent and are therefore clearly not within the privilege of counsel."

We recognize that the case presented difficult issues and required nice distinction in passing upon evidence and necessitated considerable argument respecting the admissibility or nonadmissibility of testimony. Unfortunately the trial became pregnant with an atmosphere not conducive to mature, deliberate, unimpassioned judgment and upon the whole, resulted in a verdict so excessive as to be explained only upon the theory that it was brought about by passion and prejudice. A remittitur under the circumstances will not correct the error.

The judgment will, therefore, be reversed and cause remanded for new trial.

HORNBECK, PJ, BARNES and KUNKLE, JJ, concur.